**⫼ORIGINAL**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8-26-11

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - -X

EASTON CAPITAL PARTNERS, L.P., and MOSAIX
VENTURES, L.P.,

                Plaintiffs,

     - against -

JOHN RUSH,

                Defendant.

09 Civ. 1307 (LLS)

**OPINION AND ORDER**

- - - - - - - - - - - - - - - - - - - - - - -X

    Plaintiffs Easton Capital Partners, L.P. and Mosaix Ventures, L.P. purchased shares of Sanarus Medical, Inc. and lost their entire investments. They seek to recover them in this action against Sanarus's former President and CEO John Rush, whom they allege violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder. Plaintiffs also make common law fraud and negligent misrepresentation claims.

    Rush moves for summary judgment dismissing the amended complaint.

## BACKGROUND

    The following facts are undisputed, except where noted.

### 1. Plaintiffs' Investments and Rush's Pre-Closing Disclosures

    Sanarus was a privately held corporation engaged in the medical device business. It was formed in 1999 and dissolved in 2009. Rush was its President and CEO from December 1, 2002 through March 15, 2007.

Sanarus had three product lines: Cassi, an ultrasound-guided breast biopsy device; the Visica Treatment System for the treatment and destruction of benign breast tumors; and ImarC Tissue Markers, used to mark the area of concern after a biopsy. In 2005 Sanarus earned $3.6 million in revenue but sustained a $14.9 million net loss. Of the $3.7 million in revenue, about $3.4 million came from Cassi and $200,000 came from Visica. Rush Aff. Ex. 4. Sanarus had projected $6.4 million in 2005 revenue (with $5.5 million coming from Cassi) and projected a $12.6 million net loss. Id.

In 2006 Sanarus's revenues increased to $7.2 million: $6.2 million from Cassi and roughly $500,000 from each of Visica and ImarC. Sheridan Decl. Ex. 60 at 42. It had a $13.2 million net loss, id., and at the end of 2006 Sanarus had $8 million of debt and had yet to turn a profit, id. Ex. 74.

Despite the revenue gap at the time, Sanarus management believed that Visica had greater profit and revenue potential than Cassi. Visica was in the early stages of commercial development, operated in a $696 million market, and offered a unique non-surgical treatment option, while Cassi operated in a crowded $135 million market dominated by large, established companies. Rush Aff. ¶¶ 30, 40. A presentation from Sanarus's June 7, 2006 board of directors meeting states that Cassi "Pays the Bills" and Visica "Creates the BIG value." Rush Aff. Ex. 6.

Plaintiffs are venture capital investment firms. On January 26, 2007, they purchased under a stock purchase agreement ("SPA") preferred shares of Sanarus stock as part of Sanarus's Series E financing round. Easton purchased 4,870,656 shares for $4,499,999.08, and Mosaix purchased 1,623,552 shares for $1,499,999.69. In total, $15 million was invested in Sanarus during the Series E round. The Series E shareholders had priority over shareholders from Sanarus's prior financing rounds: proceeds from a sale or liquidation would be used to repay the Series E shareholders first. Thus, Sanarus needed only $15 million in net worth for plaintiffs to recover their investments. Plaintiffs valued Sanarus at $90 million prior to the Series E financing. Sheridan Decl. Ex. 52, at 1.

Prior to closing, Sanarus provided its November 2006 Business Plan to plaintiffs. The Business Plan contained a chart comparing Cassi to five of its competitors, and listed pros and cons for each device. Cassi's cons were listed as "None". Every other device had listed cons, including, for one device, "small samples" and "Multiple passes required". Rush Aff. Ex. 2, at 10. The Business Plan stated that Cassi was being used by over 300 accounts. Other documents Sanarus gave to plaintiffs stated that the number of Cassi accounts had grown from 247 in 2005 to 334 in 2006, and projected growth up to 1,136 accounts in 2009. Pls.' Rule 56.1 Stmt. ¶¶ 32-33; Sheridan

- 3 -

Decl. Ex. 59.

The Business Plan gave revenue and operating income (or loss) projections for 2007, 2008, and 2009, respectively:   combined Cassi and ImarC revenues of $11.9 million, $24.4 million, and $37.2 million; Visica revenues of $3.6 million, $17.7 million, and $43.9 million; and operating income of minus $8.8 million, plus $8.1 million, and plus $25.9 million. Rush Decl. Ex. 2 at 28.

Sanarus also told plaintiffs prior to closing that the customer-complaint rate for Cassi II (a second-generation device introduced in early 2006) was 1.8%, below the industry standard of 2-3%.   However, the Cassi II device was having problems obtaining usable tissue samples, and recurring complaints were that it did not produce a sample on certain passes.   Rush states that in a November 2006 meeting he so informed John Friedman, Easton's managing director, and also told him that Sanarus believed the problem stemmed from inadequate piercing of the device's $CO_2$ canister, and was making efforts to fix it. Rush Aff. ¶¶ 53-56.   Friedman states that he does not recall being told about the recurring complaints. Friedman Aff. ¶ 9.   Plaintiffs claim to have been told only of earlier Cassi quality problems that Rush said had been resolved by July 2006, Pls.' Rule 56.1 Stmt. ¶ 49, and that "any ongoing quality issues were minor and were being fixed," Friedman Aff. ¶ 12.   At his deposition

Friedman testified:

    A.   . . . If the product, the representation we had gotten was that the company knew what was wrong with the product, and believed that it fixed it.

    Q.   What did they say, they knew they had fixed it or they thought they had fixed it?

    A.   They said this was the problem.  We thought we had fixed it.

    Q.   We thought we had fixed it, and they thought wrong; right?

    A.   Right, but they said this was the problem.  They didn't — they may have been wrong on the fix, and it turns out they weren't.  But they said we know the engineering problem, which is the piercing of the $CO_2$ canister, and we thought we had fixed it.  As it turned out, they had it fixed, but it didn't solve the problem.

    Q.   They told you that when?

    A.   Prior to closing.

    Q.   Prior to closing?

    A.   Yes, that they had identified the problem and thought they had fixed it.

    Q.   And it turned out they thought wrong; correct?

    A.   They thought wrong — no, they thought wrong on the — that wasn't the problem.

    Q.   It turned out when they found out that wasn't the problem, they went out and engaged a physicist, correct?

    A.   Correct, prior to closing.

    Q.   You found out about the consultant on February 13; correct?

    A.   Um-hmm.

Sheridan Decl. Ex. 1, at 166-67.

Sanarus maintained a Product Complaint Log to track customer complaints.  For each complaint it listed, among other things, the product and physician involved, and described the problem.  Before the closing, plaintiffs requested a list of physicians whom they could contact.  Rush gave plaintiffs a list of eight physicians, none of whom had reported a Cassi complaint

in 2006. Sheridan Decl. at 3-4.  In compiling that list, Rush
had asked Sanarus's sales team for "any of your physicians who
you think would be good references for new investors to speak
with," and to identify the "Products they would say the right
things about." Sheridan Decl. Ex. 65.

Regarding  its  disclosures  to  plaintiffs,  Sanarus
represented in the SPA that (1) it provided plaintiffs with all
requested  information  and  all  information  it  believed  was
reasonably  necessary  to  enable  plaintiffs  to  make  their
investment  decision;  (2)  neither  the  SPA  nor  other  related
agreements,  statements,  or  certificates  contained  an  untrue
statement of material fact or omitted to state a material fact
necessary  to  make  the  statements  in  those  documents  not
misleading; (3) no fact of which it was aware "that has had or
would  be  reasonably  be  expected  to  have  a  material  adverse
effect upon the financial condition, operating results, assets,
customer or supplier relations, employee relations or business
prospects of the Company" had not been disclosed; and (4) that
"any projections of its future operations" were prepared in good
faith and on a reasonable basis. SPA § 2.16.[1]  A separate SPA
provision  made  similar  representations  specifically  concerning
the Business Plan. See id. § 2.23.  Sanarus further represented

---

[1] Annexed as Exhibit 46 to the Declaration of Thomas I. Sheridan, III.

that since November 30, 2006,

> there has been no change, event, development or effect
> (and the Company has no knowledge of any change,
> development or effect) that individually or when taken
> together with other changes, events, developments or
> effects is materially adverse or might reasonably be
> expected to be materially adverse to the general
> affairs, business operations, assets, condition
> (financial or otherwise) or results of operations or
> prospects of the Company taken as a whole . . . .

Id. § 2.25.  Sanarus also represented that "there has been no
resignation or termination of employment of any officer or key
employee of the Company," id., that it had not been notified of
any such resignation, id., and that it was not aware that any
officer or key employee "intends to terminate their employment
with the Company," id. § 2.21.

On the day of the closing, Rush executed a Compliance
Certificate, which states that "The representations and
warranties of the Company contained in Section 2 of [the SPA]
are true and correct as of the date hereof." Sheridan Decl. Ex.
53.

## 2. The February 13, 2007 Board of Directors Meeting and the Alleged Misrepresentations

After plaintiffs made their investments, Friedman attended
Sanarus's February 13, 2007 board of directors meeting.  A
PowerPoint presentation from that meeting shows that the
complaint rate for Cassi II increased steadily throughout 2006,
up to 1.8% in the fourth quarter, and that in the latter half of

- 7 -

2006, the "Biggest Issue = Inadequate Samples from Cassi." Sheridan Decl. Ex. 60, at 21, 23.   It states that there was inadequate piercing of the $CO_2$ canister, and that Sanarus designed, tested, and implemented in November 2006 a fix to the piercing issue, which it expected to "largely solve" the sampling problem. Id. at 23. The presentation later reveals, however, that although the fix solved the piercing issue, it had not solved the sampling issue as Sanarus had expected, and that Sanarus had engaged a physicist to help solve the sampling problem. Id. at 26.

Friedman also learned at the meeting that Sanarus had hired a marketing consultant in January 2007 to get feedback from Cassi customers. Id. at 24.   The consultant contacted 206 customers, 81 of whom responded. Id. at 25.   Of those 81, 11 reported having problems with the product, including nine complaints of "insufficient or no tissue sample." Id.

The presentation also shows that the number of Cassi accounts peaked at 341 in the second quarter of 2006, then declined to 323 and 300 in the next two quarters. Id. at 35.   It also revealed what the parties refer to as the "account churn": 38.7% of customers who had used the Cassi II device during 2006 had stopped by year's end, at which time there were 210 inactive accounts in addition to the 300 active ones. Id. at 34.

The presentation makes suggestions for the Cassi program in

2007, including "Go slow, rebuild rep and customer confidence" and "More focus on building treatment." Id. at 37.   Regarding those suggestions, Rush testified that he wanted to "reduce our expectation of Cassi this year until we know we have the fixes all completed and we rebuild that confidence and then we can push again and we'll spend more time and more energy developing the treatment program." Id. Ex. 3 at 168-69.   That would reduce the emphasis on adding new Cassi accounts, which would reduce revenue. Id. at 169.

Rush resigned from Sanarus on March 15, 2007.

Plaintiffs claim that the February 13 presentation revealed that many of Rush's pre-closing representations were false or misleading, and omitted material facts.   They argue that the chart in the Business Plan listing Cassi's cons as "None" was false in light of Cassi II's sampling problem, which was listed as a con of a competing device.   Next, they argue that the Business Plan's statement that Cassi was being used by over 300 accounts and the disclosure that Cassi accounts grew from 247 in 2005 to 334 in 2006 were false and misleading because of the drop in the number of Cassi accounts from 341 in the second quarter of 2006 to 300 in the fourth quarter, and the account churn.   Plaintiffs further contend that the nondisclosure of the sampling problem, drop in accounts, and account churn rendered misleading the statements that Sanarus's revenue had doubled

- 9 -

from 2005 to 2006. They also argue that the representation that Cassi II's complaint rate was 1.8% was misleading because of the nondisclosure of the sampling problem, account churn, and marketing survey.

In addition, plaintiffs argue that the physician reference list Rush provided them was misleading because it did not include any of the physicians who had complained about the Cassi sampling problem.

Finally, plaintiffs contend that the SPA contained several misrepresentations. First, they argue its provisions regarding Sanarus's disclosures to plaintiffs (§ 2.16), the Business Plan (§ 2.23), and lack of material changes (§ 2.25) were false because the problems with Cassi were not disclosed. Second, they argue that Sanarus had no reasonable basis for its projections of its future profitability and account and revenue growth, and that they were not made in good faith, in violation of sections 2.16 and 2.23. Third, plaintiffs argue that the SPA provisions regarding officer or key employee resignation were misleading because Rush was "actively considering other employment" by January 26, 2007.

### 3. Later Events and Sanarus's Dissolution

The presentation from Sanarus's April 12, 2007 board meeting (after Rush's resignation) states that Sanarus would "Reset 2007 Plan & Expectations," including that it would

- 10 -

"Downsize organization while we get Cassi right and prepare for
Visica commercialization." Rush. Aff. Ex. 20 at 15.   The Cassi
sampling problems and account churn continued, and the
presentation stated that "CASSI could have negative impact on
Visica." Id. at 32.   Sanarus also projected reduced revenue and
income.   The November 2006 Business Plan had projected $15.5
million in 2007 revenues ($11.9 million from Cassi and ImarC,
and $3.6 million from Visica) and an operating loss of $8.8
million. Id. Ex. 2 at 28.   Sanarus now projected $8.1 million in
2007 revenues ($5.4 million from Cassi, $1.4 million from Visica,
and $1.3 million from "Other") and an operating loss of $10
million. Id. Ex. 20 at 45.   Sanarus's performance in 2007 did
not meet even the lowered expectations:   it generated only $6.4
million in total revenue, with $4.5 million coming from Cassi
and $836,000 from Visica, and had an operating loss of $11.8
million. Sheridan Decl. Ex. 88.

The February 1, 2008 board meeting presentation states that
"Cassi performance is not as good as competition", which "is
getting more aggressive," and that Cassi "Needs to get a sample
every time." Sheridan Decl. Ex. 83 at 15.   According to the
April 14, 2008 board meeting presentation, Sanarus's "Primary
Goals" concerned Visica, and its "Secondary Goals" concerned
Cassi and ImarC. Id. Ex. 79 at 32.   Sanarus further reduced
revenue and income projections. Id. at 38.

- 11 -

In mid-2008 Sanarus hired two investment banks to find "a strategic acquirer" for it. Def's. Rule 56.1 Stmt. ¶ 29.   One stated in an April 2008 presentation that to have an initial public offering opportunity, Sanarus "would want $30MM run rate, strong Visica traction and 12 month path to profitability", and that for a "Sale to large strategic buyer," the "Likely outcome is upfront payment on current revenues + earn-outs for future Visica ramp." Tracy Cert. Ex. 9, at 2.     Its overall recommendation for an exit was to "fund through initial demonstration of Visica ramp." Id.

On May 15, 2008, Sanarus borrowed $7 million from its preferred investors.     Plaintiffs loaned Sanarus a combined $651,896 (approximately 11% of their initial investment) at 7% annual interest.   Friedman testified that the purpose of the financing was "To try and resolve Cassi issues and support company to an exit." Sheridan Decl. Ex. 1, at 109.   He stated that Sanarus's exit strategy was to be bought by some other medical device company, and at some point in 2008, Sanarus was "talking initially" about getting $50 or $60 million for the sale. Id. at 110.

The June 18, 2008 board meeting presentation states that "Cassi continues to hold well in the marketplace." Id. Ex. 80, at 7.

From January 1 through November 30, 2008, Cassi generated

- 12 -

$2.2 million in revenue, Visica generated $950,000 in revenue, and Sanarus had an $8 million operating loss. Sheridan Decl. Ex. 81 at 9.

On December 2, 2008, plaintiffs loaned an additional $378,959 (6.3% of their initial investment) to Sanarus at 13% annual interest. The December 10, 2008 board meeting presentation notes a "consistent sales trend" for Cassi and ImarC, and states that "ImarC and new Cassi[2] will provide entrée for Visica." Id. Ex. 81, at 14-15.

The February 19, 2009 board meeting presentation states that if Sanarus should be unable to find a buyer by March 2, it would begin selling its assets, settle with its creditors, and shut down the company. Id. Ex. 82, at 35. Sanarus did not find a buyer, and it was dissolved in May 2009. Its assets were sold in July 2009 for $625,000. Id. Ex. 98. Plaintiffs did not receive any of the asset-sale proceeds. Their shares and loans are worthless. Plaintiffs have "not received anything of value" for their shares, and no principal or interest payments were ever made on their loans. Friedman Aff. ¶ 24-26; Lal Aff. ¶ 21-23.

## DISCUSSION

Under Federal Rule of Civil Procedure 56(a), "the court shall grant summary judgment if the movant shows that there is

---

2 Sanarus had been working on a redesigned Cassi product throughout 2008.

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "This standard requires that courts resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (internal quotation marks omitted).

The elements of a claim under Section 10(b) and Rule 10b-5 are that the defendant "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks omitted).

### 1.  Rush's Alleged Misrepresentations

Rush argues that the record is clear that he told Friedman prior to closing that Cassi was experiencing sampling problems, but that he thought they were fixed.  Rush does not state when he learned that the fixes on which Sanarus was working before the closing did not cure the sampling problem.  Sanarus implemented in November 2006 a fix to Cassi's $CO_2$ canister that it expected to "largely solve" the sampling problem. Sheridan Decl. Ex. 60, at 23.  Though the fix worked as intended, it did not solve the problem.   The February 13 board meeting

presentation revealed that Cassi still had a problem with ice formation "resulting in inadequate sampling" and which Sanarus had "engaged a physicist from UK to help solve". Id. at 26-29. The physicist's proposal for the Cassi work is dated January 9, 2007, and it states that the scope of the work was outlined in a December 19, 2006 discussion with Rush and others from Sanarus. Id. Ex. 11, at 1, 5.  Thus, a jury could find that Rush knew at the time of the closing that the fixes he disclosed to plaintiffs before the closing had not solved the sampling problem.  Given the importance of the problem, a jury could find that to be a material omission.

Regarding the account churn, Rush states that he knew in mid-2006 that 39% of Cassi accounts "would not place regular orders subsequent to an initial trial order." Rush Aff. ¶ 72. He states that there were several possible causes of the account churn unrelated to the sampling problem, see id. ¶¶ 73-78, and that at the time of plaintiffs' investments "it was indeterminate the extent to which the churn was being caused by these various disparate factors, although it appears to have been driven in substantial part by non-quality related issues such as sales focus", id. ¶ 78.  The point is that Rush knew of the churn and did not disclose it.  That Sanarus was failing to retain 39% of its Cassi accounts cannot be ruled summarily to be immaterial, regardless of its cause.

Documents given to plaintiffs prior to closing showed that the number of Cassi accounts had grown from 247 in 2005 to 334 in 2006, but the February 13, 2007 board meeting presentation revealed that the number of accounts had declined from 341 in the second quarter of 2006 to 300 in the fourth quarter. Rush testified that he received reports on the number of Cassi accounts every month, Sheridan Decl. Ex. 3, at 96-97, and that he would have seen in January 2007 that the number of accounts had dropped to 300, id. at 153. Thus, plaintiffs were told that Sanarus had gained 87 Cassi accounts from 2005 to 2006, but not told that it had lost 41 accounts in the latter half of 2006. A jury might find that omission from the mix of information given to plaintiffs to be a material one.

The marketing survey also presents a jury question. The parties could not find a copy of the survey during discovery, but plaintiffs argue that Sanarus must have received it before the January 26, 2007 closing because the consultant sent her bill on January 15 and Sanarus approved the payment on January 23. Rush states, in his affidavit submitted with his motion, that "The results and implications of the survey were not fully considered by the company until after the Series E closing. Accordingly, there was nothing conclusive regarding this survey to disclose to the Plaintiffs prior to the closing." Rush Aff. ¶ 84. That implies that the results of the survey were at least

known to Sanarus by the time of the closing.  He states in his
affidavit submitted with his reply brief that "I definitively
state that I have absolutely no recollection of seeing the
results of the Cassi customer marketing survey prior to the
Series E closing." Rush Reply Aff. ¶ 2.  He does not state when
he learned of them, or of the underlying facts.  Rush also
argues that the survey's results were immaterial because not all
customers were contacted and only 81 responded but a jury could
disagree, given the striking difference between the complaint
rate from the survey (11 out of 81, or 13.6%) and the rate
disclosed to plaintiffs (1.8%).

The evidence is not conclusive in Rush's favor on the
Business Plan's listing "None" cons for Cassi.  He argues that
chart was a comparison of the pros and cons of the devices "as
designed," Def.'s Mem. 2-3, and "as working in the ordinary
course of business," id. at 15, and not an absolute list of all
pros and cons of the devices, and Friedman testified that the
chart was a comparison of pros and cons "relative to the
competition" and is "not an absolute." Sheridan Decl. Ex. 1, at
48.  However, Lal testified that he thought the chart reflected
how Cassi was performing in practice. Sheridan Decl. Ex. 2, at
30-31.

A reasonable jury could also find that the physician
reference list that Rush provided to plaintiffs was misleading

because Rush sought to include only physicians who "would say the right things about" Sanarus's products.

## 2. Loss Causation

"It is settled that causation under federal securities laws is two-pronged:   a plaintiff must allege both transaction causation, i.e., that but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, i.e., that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis in original).

Transaction causation is not in issue on this motion.

"Loss causation, by contrast, is the proximate causal link between the alleged misconduct and the plaintiff's economic harm." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 106 (2d Cir. 2007).   It was codified in the Private Securities Litigation Reform Act of 1995, which states:   "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate the chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

"The loss causation requirement is intended to 'fix a legal limit on a person's responsibility, even for wrongful acts.'" Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 186 (2d Cir.

2001), quoting First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769-70 (2d Cir. 1994). It effectuates the purpose of the securities statutes to make private securities fraud actions "available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345 (2005). Thus, while plaintiffs may not be "required to allege the precise loss attributable to" the defendant's fraud, Lentell v. Merrill Lynch & Co., 396 F.3d 161, 177 (2d Cir. 2005), where their total loss is "the difference between the purchase price and the sell price," they "bear the burden of producing evidence sufficient for a fact finder to 'ascribe some rough proportion of the whole loss' to defendants' fraud," In re Vivendi Universal, S.A. Sec. Litig., 634 F. Supp. 2d 352, 369-70 (S.D.N.Y. 2009), quoting Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 158 (2d Cir. 2007).

Rush argues that there is no evidence that plaintiffs' loss was caused by his alleged misrepresentations about the problems with Cassi II, as opposed to Visica's failure to meet its projected revenues and the economic downturn of 2008. Lal and Friedman, in similar language, state plaintiffs' position:

> Sanarus went out of business because it ran out of money to continue in business. If Cassi had been as represented, Sanarus would not have been forced to go out of business, and Mosaix [or Easton] would not have

lost its investment. If Sanarus had been as represented, it would not have been difficult for Sanarus to increase Cassi-related revenues to the levels that Sanarus predicted prior to the closing. If that had been achieved, then Sanarus would have become profitable and would not have run out of money. In addition, if that had been achieved, then Sanarus would have had a net equity value of at least $15 million, an amount adequate for full recovery of our investment.

Lal Aff. ¶ 9; see Friedman Aff. ¶6.

A reasonable jury could find that the topic of the alleged misrepresentations was the cause of Sanarus's ultimate demise: the Cassi problems were never resolved and sales never reached a viable level. Sanarus's demise may not be solely attributable to the alleged misrepresentations, but the effects of the other potential causes to which defendants point remain unresolved issues of fact. Though Visica sales did not grow as anticipated, Rush states that "Cassi was to serve as a means to establish a relationship with accounts which would ultimately purchase Visica," Rush Aff. ¶ 48, and Sanarus's April 12, 2007 board meeting presentation states that "CASSI could have negative impact on Visica", id. Ex. 20, at 32. And though defendants tender the economic downturn in 2008 as a cause of the loss, the record does not establish it as a major cause. The record does show the Cassi problems that were disclosed at the February 13, 2007 board meeting, and that Cassi revenues declined and it became no longer a product that "pays the bills." A reasonable jury could conclude that Cassi's problems predominantly caused

Cassi revenues to decline, and that the revenue decline caused Sanarus's demise and plaintiffs' loss.

The calculation of the amount due to plaintiffs, if successful, may be complicated by two factors. First, at the time of the initial investment, Sanarus was not totally without value. That is demonstrated by the fact that earnings in each of its three products had grown substantially from 2005 to 2006, and that Cassi had at least some prospects of market success if its problems could be genuinely fixed: in April 2007 Sanarus projected that Cassi revenues would decline in 2007 "while we get Cassi right", but that Cassi revenues would then grow in 2008 and 2009. Rush Aff. Ex. 20, at 15, 45. Second, in 2008, all but one of Sanarus's Series E investors loaned money to Sanarus, Sheridan Decl. Ex. 78, including plaintiffs, who both extended two loans to Sanarus, although they then knew much more about Sanarus's difficulties than had been disclosed to them when they first invested. They argue that the additional investments were made in an ultimately futile attempt to salvage the situation, but that very argument establishes that the situation, even with their greater knowledge of the true facts, was seen as retaining at least a hope of salvageability.

Thus evaluation of the argument for rescission of the original investment requires considerably more than is shown on the present record, and a calculation of what plaintiffs

received in return at the time of their original investment requires more factual and expert analysis, unsuited for resolution on summary judgment.

### 3. Scienter

Defendants argue that plaintiffs have not established scienter, "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Maker Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (internal quotation marks omitted). "Issues of motive and intent are usually inappropriate for disposition on summary judgment. In a § 10(b) action, a court may not grant such relief to the defendants on the ground of lack of scienter unless the plaintiff has failed to present facts that can support an inference of bad faith or an inference that defendants acted with an intent to deceive." Wechsler v. Steinberg, 733 F.2d 1054, 1058-59 (2d Cir. 1984) (citations omitted).

As discussed above in section 1 of the Discussion, a jury could find that Rush sought to include only physicians who would "say the right things about" Sanarus's products on the reference list he provided to plaintiffs, and that he knew at the time of plaintiffs' original investment, but did not disclose, that the Cassi fixes did not solve the sampling problem, that the number of Cassi accounts was decreasing, and of the account churn and 13.5% complaint rate from the marketing survey. A jury could

infer from those facts that Rush acted in bad faith or with the intent to deceive plaintiffs.

### 4.  Reliance

Rush argues that plaintiffs did not perform sufficient due diligence before investing to allow them to establish that they justifiably relied on his alleged misrepresentations.   "An investor may not justifiably rely on a misrepresentation if, through minimal diligence, the investor should have discovered the truth." Starr ex rel. Sampson v. Georgeson S'holder, Inc., 412 F.3d 103, 109 (2d Cir. 2005) (internal quotation marks omitted).   Friedman and Lal describe the due diligence plaintiffs performed:

> Working together, Easton and Mosaix performed extensive due diligence prior to the closing.   They visited Sanarus' offices in California, toured its facilities, and interviewed management.   They reviewed and analyzed voluminous documentation provided by Sanarus as well as additional documents requested by them.   They made numerous due diligence calls to check references provided by the Company and spoke to their own independent experts.   They spoke to doctors who used Sanarus' products.   They engaged legal counsel to perform intellectual property due diligence.   Legal counsel performed such due diligence and billed $50,000 for that work, which Sanarus paid pursuant to Section 7.7 of the Agreement.

Friedman Aff. ¶ 20; see Lal Aff. ¶ 16.   Rush does not contest that description.   He argues that plaintiffs' due diligence was insufficient as a matter of law because they did not ask for board meeting materials and sales data, and that the allegedly undisclosed facts were readily discoverable from Sanarus's books

and records, to which plaintiffs had full access.  That argument is not persuasive.  Friedman and Lal state that they did review sales figures. Friedman Aff ¶ 16; Lal Aff. ¶ 13.  Rush has not established that plaintiffs were required to review any documents in addition to those Sanarus provided to them:  the SPA states that plaintiffs' ability to request documents from Sanarus and ask it questions regarding its "business, properties, prospects and financial conditions", "does not limit or modify the representations and warranties of the Company in Section 2[3] of this Agreement or the right of such Investor to rely thereon." SPA § 3.3.  Finally, the parties have submitted conflicting expert reports on the sufficiency of plaintiffs' due diligence. See Tracy Cert. Ex. 11; Sheridan Decl. Ex. 4.

### 5.  Statute of Limitations

Rush argues that plaintiffs' complaint was not timely because it was filed more than "2 years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b). Plaintiffs filed their complaint on February 13, 2009 — two years to the day from the February 13, 2007 board meeting.  Rush states: "It was my customary practice to send Board of Directors' meeting materials to participants several days before a meeting. Accordingly, I would have emailed to the Plaintiffs the Feb. 13, 2007 PowerPoint several days before the meeting." Rush Aff. ¶ 62.

---

3 See pp. 6-7, supra.

Regardless of Rush's alleged customary practice, there is no evidence that plaintiffs received the February 13, 2007 board meeting presentation before the meeting. Lal states that he was not sent the materials for that board meeting. Lal Aff. ¶ 8. Friedman states: "I specifically recall being shocked at the facts disclosed by Defendant during the February 13, 2007 board meeting. Those facts had not previously been disclosed to Easton." Friedman Aff. ¶ 15. Easton did receive a copy of the presentation, but Friedman states that Easton's copy was "Last saved by: jrush" and "Modified" on "February 13, 2007, at 2:23:53 PM." Id.; see Sklar Decl.

### 6. Ratification

Rush argues that plaintiffs ratified their investments because, following the February 13, 2007 board meeting, "they failed to object to the alleged fraud and neither sought rescission of their investment nor raised their concerns at a board meeting or with company management until nearly two years later." Def.'s Mem. 33. Ratification is "an expression of willingness on the part of a party to a contract to abide by its terms, even after it has enough information upon which to exercise its right to disaffirm the existence of the contract." Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank, 850 F. Supp. 1199, 1213 (S.D.N.Y. 1994). It is an affirmative defense on which Rush bears the burden of proof, see

- 25 -

id., inappropriate for resolution on this motion on which all ambiguities, and all factual inferences, must be viewed in favor of plaintiffs.  As explained on pages 21-22, supra, plaintiffs' loans to Sanarus in 2008 do not necessarily reflect reaffirmance of their original decisions to invest.

### 7.  Other Claims

The above analysis of plaintiffs' section 10(b) claim applies equally to their claim for common law fraud, see Hunt v. Enzo Biochem, Inc., 530 F. Supp. 2d 580, 592 (S.D.N.Y. 2008) (identical analysis applies to common law fraud and § 10(b) claims), and the factual and legal disputes regarding the claim for negligent misrepresentation are also best resolved at trial.

### CONCLUSION

Defendant's motion for summary judgment (Docket No. 24) is denied.

The parties shall appear for a conference on September 30, 2011 at 2:30 p.m. to discuss, among other things, the schedule for any remaining discovery and the preparation of the parties' joint pre-trial order and other pre-trial materials, and setting a date for trial.

So ordered.

Dated:  New York, New York
        August 25, 2011

                                    Louis L. Stanton
                                    LOUIS L. STANTON
                                    U. S. D. J.

- 26 -